NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

APR 24 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SAVE THE COLORADO; et al., | No. 23-15247 |
| Plaintiffs-Appellants, | D.C. No. 3:19-cv-08285-MTL |
| v. | |
| U.S. DEPARTMENT OF THE INTERIOR; DEB HAALAND, Secretary of the Interior, | MEMORANDUM* |
| Defendants-Appellees, | |
| COLORADO RIVER ENERGY DISTRIBUTORS ASSOCIATION; et al., | |
| Intervenor-Defendants-Appellees, | |
| ———————————————— | |
| STATE OF NEW MEXICO, | |
| Intervenor. | |

Appeal from the United States District Court
for the District of Arizona
Michael T. Liburdi, District Judge, Presiding

Argued and Submitted February 6, 2024
Phoenix, Arizona

Before: MURGUIA, Chief Judge, and HAWKINS and JOHNSTONE, Circuit

---

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Judges.

Save the Colorado, Living Rivers, and Center for Biological Diversity (collectively, "Appellants") appeal the district court's grant of summary judgment for the U.S. Department of the Interior, the Secretary of the Interior ("Secretary"), and intervenors (collectively, "Interior") and the denial of Appellants' motion for summary judgment. Appellants maintain that Interior violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–70, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, first when it issued a Record of Decision and Final Environmental Impact Statement ("FEIS") for the Long-Term and Experimental Management Plan ("LTEMP") and second when it declined to prepare a Supplemental Environmental Impact Statement ("SEIS"). The LTEMP is a twenty-year adaptive framework to manage the monthly, daily, and hourly water releases from Glen Canyon Dam. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

We review de novo the district court's ruling on cross-motions for summary judgment. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1032 (9th Cir. 2020). Our review of Interior's compliance with NEPA is governed by the APA's deferential arbitrary and capricious standard. *Friends of Animals v. U.S. Fish & Wildlife Serv.*, 28 F.4th 19, 28 (9th Cir. 2022); 5 U.S.C. § 706(2)(A). "Under this standard, we 'must determine whether [Interior] considered the

relevant factors and articulated a rational connection between the facts found and the choices made.'" *Friends of Animals*, 28 F.4th at 28 (quoting *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007)).

1. We agree with the district court that the LTEMP FEIS purpose and need statement was reasonable. *See Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013). A purpose and need statement must "briefly specify the underlying purpose and need to which the agency is responding." 40 C.F.R. § 1502.13 (1978) (amended 2020).[1]

Appellants contend that Interior impermissibly elevated hydroelectric power generation in its purpose and need statement. We disagree. Interior developed the LTEMP FEIS pursuant to the Grand Canyon Protection Act of 1992, which directs the Secretary to operate Glen Canyon Dam in a way that protects downstream resources and meets water storage and release obligations set forth in other existing legal authorities. *See* Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, § 1802(a)–(b), 106 Stat. 4600, 4669 (1992). One such authority is the Colorado River Storage Project Act of 1956, which directs the Secretary to operate hydroelectric powerplants—including Glen Canyon Dam—"to

---

[1] Because the 1978 versions of NEPA's implementing regulations were in effect when Interior issued the LTEMP FEIS, we cite to the 1978 versions here.

produce the greatest practicable amount of power and energy" so long as it does not "affect or interfere with" the integrity of other non-power beneficial uses. 43 U.S.C. § 620f; *see also id.* § 620 (describing hydroelectric power production as "an incident of" other water uses). The LTEMP FEIS purpose and need statement recognized this balance, listing "the generation of hydroelectric power" as but one objective following a list of non-power needs the LTEMP was to serve. *See City of L.A. v. Fed. Aviation Admin.*, 63 F.4th 835, 844 (9th Cir. 2023) ("It is appropriate for an agency to draft a purpose and need statement with reference to the agency's statutory mandates.").

Appellants also argue that the purpose and need statement was too narrow because it did not include "the need to adaptively manage Glen Canyon Dam under all projected climate change conditions." However, Appellants have not shown that this omission made the purpose and need statement unreasonable, especially given the LTEMP's intended function and the statutory context in which the FEIS was to be developed. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866–68 (9th Cir. 2004) (reviewing purpose and need statement considering the agency's statutory objectives and the project's focus).

Thus, in view of the "considerable discretion" we afford agencies in defining the scope of their projects, *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059,

1066–67 (9th Cir. 1998), we conclude that the LTEMP FEIS purpose and need statement complied with NEPA.

2. We further agree with the district court that Interior adequately considered a reasonable range of alternatives to address the LTEMP FEIS's stated purpose and need. *See* 40 C.F.R. § 1502.14(a) (1978) (amended 2020). The seven alternatives that the LTEMP FEIS examined in full were sufficiently distinct. The alternatives featured several "different operational strategies (e.g., consistent monthly release pattern or condition-dependent release pattern) or had different primary objectives," ranging from native fish recovery to hydropower generation. This range of alternatives allowed Interior and the public to evaluate multiple, reasonable plans for the timing of dam releases. *See Westlands*, 376 F.3d at 872.

Interior also did not unreasonably decline to consider Appellants' proposed alternatives without adequate explanation. Each of Appellants' proposed alternatives would either reduce (or eliminate) hydropower generation at Glen Canyon Dam or run afoul of the LTEMP's limited purpose of creating monthly, daily, and hourly water release schedules. *See League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1072–73 (9th Cir. 2012). The LTEMP FEIS adequately articulated these concerns. *See* 40 C.F.R. § 1502.14(a) (1978). And although NEPA required Interior to consider "reasonable alternatives not within [its] jurisdiction," 40 C.F.R § 1502.14(c) (1978), Appellants

5

failed to establish that their proposed alternatives were reasonably viable. *See City of Angoon v. Hodel*, 803 F.2d 1016, 1021–22 (9th Cir. 1986).

3. We also reject Appellants' contention that Interior failed to take a "hard look" at the environmental consequences of the LTEMP in light of climate change. *See Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 984 (9th Cir. 2022). Because the LTEMP controls the sub-annual timing of water releases from Glen Canyon Dam—and not the volume of water it must release each year[2]—Interior reasonably focused its climate-change analysis on comparing the performance and effect of each of the seven alternatives under various climate change conditions, rather than providing a full-fledged assessment of water availability in the Colorado River Basin. *See id.* at 985–86; *see also* 40 C.F.R. § 1500.1(b) (1978) (amended 2020) (stating that agencies are to "concentrate on the issues that are truly significant to the action in question"). Interior ran models of each alternative, assuming annual release rates between 7 maf and 19.2 maf, with a median of 8.23

---

[2] Annual water release volumes are prescribed by the Criteria for the Coordinated Long-Range Operations of Colorado River Reservoirs, 35 Fed. Reg. 8951 (June 10, 1970), and the Review of Existing Coordinated Long-Range Operating Criteria for Colorado River Reservoirs, 70 Fed. Reg. 15873 (Mar. 29, 2005), as currently implemented through the 2007 Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lake Powell and Lake Mead ("2007 Interim Guidelines"), 73 Fed. Reg. 19873 (Apr. 11, 2008). Under the 2007 Interim Guidelines, Glen Canyon Dam must release water according to four operating tiers, each of which is determined annually based on hydrological conditions. Even under the lowest tier, Glen Canyon Dam must release at least 7 million-acre feet ("maf") of water annually. *See* 2007 Interim Guidelines, 73 Fed. Reg. at 19890.

maf, throughout the LTEMP period. Interior then applied these models to 21 hydrologic scenarios, which "represented a range of possible [conditions] from dry to wet." The scenarios were based on historic annual inflow rates into Lake Powell (from 1906 to 2010) and were "weighted according to their frequency of occurrence" in the Bureau of Reclamation's 2012 Colorado River Basin Water Supply and Demand Study ("Basin Study"). Interior "gave greater weight to the driest years to represent their expected increased frequency of occurrence under a climate-change scenario." After running these models, Interior concluded that the "differences in hydrology would influence the relative effect of LTEMP alternatives on resources, but, in general, the analysis conducted for this EIS indicates that the differences would be relatively small (<5%) and not differ greatly among alternatives."

Appellants argue that Interior's reliance on historical inflow data in its climate analysis rendered it "stale." We disagree. Although Interior could have chosen a methodology that used forward-looking projections to conduct this analysis, it accounted for future drying trends by overweighting the driest years observed. Because there is no evidence that the choice to use historical data rendered its findings unreasonable or inaccurate, we defer to Interior's technical expertise. *See League of Wilderness Defs.*, 752 F.3d at 763–64; *cf. N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1085–86 (9th Cir. 2011) (rejecting

agency's use of decades-old aerial surveys to estimate then-existing fish counts because the surveys lacked an indication of reliability).

Interior also did not arbitrarily omit relevant worst-case climate change conditions from the Basin Study in its climate change assessment. *See Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 785 (9th Cir. 2001). Interior recognized that its simulations "were not representative of the full range of expected inflow variation under [the Basin Study's] climate change scenario" because "[a]bout 30%" of the mean annual inflow rates projected by the Basin Study were lower than the lowest inflow rates Interior modeled. But based on results from the models it ran, Interior determined that further analysis was unnecessary because "the relative performance of the alternatives would be consistent regardless of the uncertainty of the effects of climate change."[3] In other words, the historically weighted simulations adequately informed Interior's choice among alternatives given the small differences in their relative performance under a variety of climate conditions.

---

[3] It is discernible from the LTEMP FEIS that Interior chose to omit the Basin Study's worst-case climate scenarios from its climate change models because (1) the projected conditions did not occur in the historical record, and (2) the models demonstrated that the alternatives' downstream effects would remain fairly consistent—overall and relative to one another—even under drier climate conditions. These rationales reasonably support this omission. *Cf. Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993).

Even without the Basin Study's worst-case conditions, the LTEMP FEIS climate change model served its purpose as a tool to compare the relative robustness of the alternatives under changing climate conditions; it was never intended to predict those conditions. *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1109–10 (9th Cir. 2016) (accepting agency's use of a disputed model in light of its "limited purpose"; the agency's attempt to "account[] for the uncertainty of the variables involved"; and the agency's disclosure of "the assumptions on which it built the model and the uncertainties inherent in it"). "NEPA does not require that we decide whether an [FEIS] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology." *350 Mont. v. Haaland*, 50 F.4th 1254, 1271–72 (9th Cir. 2022) (quoting *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985)).

4. However, Interior violated NEPA by failing to explain its decision not to prepare an SEIS.[4] "An agency must make a reasoned decision whether an SEIS is

_____

[4] Because we consider Interior's silence in response to Appellants' June 2019 demand letter to be a decision not to prepare an SEIS, we review it under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A). *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556 (9th Cir. 2000). Accordingly, the district court did not abuse its discretion in denying Appellants' motion to supplement the record or take judicial notice of post–SEIS-letter information. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996).

required," which we must be able to discern from the record. *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 855 (9th Cir. 2013) (citing *Friends of the Clearwater*, 222 F.3d at 557). Interior never responded to Appellants' demand letter, which contained studies published after the release of the LTEMP FEIS that purportedly undermined its climate change analysis. Thus, there is no "reasoned decision, documented in the record" explaining why an SEIS was not required for us to review. *Id.*

Ultimately, though, this error was harmless. *See* 5 U.S.C. § 706. An agency must prepare an SEIS "if . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1978) (amended 2020). But by Appellants' own admission, the "collection of research" they presented "relie[d] primarily on data which was available at the time of the LTEMP FEIS' publication." At best, the studies reflect different methodological choices that were before Interior when it published the LTEMP FEIS. *See 350 Mont.*, 50 F.4th at 1271–72. And although the studies collectively show that "hot droughts" are increasingly likely to occur, the LTEMP FEIS acknowledged that "increases in temperature and decreases in water supply . . . driven by global climate change" were likely. Thus, Interior reasonably decided that it could evaluate the relative

performance of the alternatives under changing climate conditions by treating these trends as external uncertainties.

Because there is no indication that the studies contain information "not already considered" or that would "materially affect[] the substance of [Interior's] decision" regarding the timing of water releases from Glen Canyon Dam, no prejudice resulted from Interior's failure to respond to Appellants' letter. *Idaho Wool Growers*, 816 F.3d at 1104–06.

**AFFIRMED**.